DAVIDOFF HUTCHER & CITRON LLP
*Proposed Attorneys for the Debtor and*
*Debtor-in Possession*
605 Third Avenue
New York, New York 10158
(914) 381-7400
Robert L. Rattet, Esq.

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x

In re:

BEAR'S FRUIT LLC,

                     Debtor.
------------------------------------------------------------------ x

Chapter 11 (Subchapter V)

Case No. 25-43951 (JMM)

## MOTION FOR ORDER (I) AUTHORIZING DEBTOR TO OBTAIN POST-PETITION FINANCING, (II) GRANTING LIENS AND SUPER-PRIORITY ADMINISTRATIVE EXPENSE STATUS PURSUANT TO SECTION 364(c) OF THE BANKRUPTCY CODE, AND (III) GRANTING RELATED RELIEF

Bear's Fruit LLC (the "Debtor"), as debtor and debtor in possession, respectfully states as follows in support of this motion (this "DIP Motion") in its above-captioned chapter 11 case (the "Chapter 11 Case"), pursuant to sections 105, 361, 362, 364, 503, 506(c) and 507 of title 11 of the United States Code 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and the Local Bankruptcy Rules for the Eastern District of New York (the "Local Bankruptcy Rules"), seeking entry of interim order (the "DIP Interim Order"), substantially in the form of **Exhibit A** attached hereto, and a final order, among other things: (1) authorizing the Debtor to obtain post-petition financing (the "DIP Financing") pursuant to a super-priority, secured debtor-in-possession revolving line of credit (the "DIP Line of Credit") with Mr. Forwood Cloud Wiser III (the "DIP Lender") in accordance with and subject to the terms and conditions set forth in the

DIP Commitment Letter (as defined herein) in the aggregate principal amount not to exceed at any one time $150,000.00, which shall be made available to the Debtor in accordance with and subject to the terms of the DIP Commitment Letter and the Budget (attached hereto as **Exhibit B**); (2) authorizing the Debtor to execute, deliver, and perform under the DIP Commitment Letter and all other loan documentation related to the DIP Line of Credit (collectively, with the DIP Commitment Letter, the "DIP Documents"); (3) authorizing the Debtor to incur obligations with respect to loans, advances, extensions of credit, financial accommodations, reimbursement obligations, fees, costs, expenses, and other liabilities, all other obligations due and payable under the DIP Documents (collectively, the "DIP Obligations"); (4) granting to the DIP Lender an allowed super-priority administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code in respect of all DIP Obligations; (5) granting to the DIP Lender valid, enforceable, non-avoidable and automatically perfected liens pursuant to section 364(c)(2) of the Bankruptcy Code on the DIP Collateral (as defined below) and all proceeds thereof; (6) authorizing the Debtor to use proceeds of the DIP Line of Credit solely in accordance with and subject to the Budget and the DIP Documents; (7) authorizing the Debtor to pay the principal, interest, fees, expenses, and other amounts payable under the DIP Documents as such become earned, due, and payable to the extent provided in, and in accordance with and subject to, the DIP Documents; (9) authorizing the Debtor to pay all amounts outstanding to Express Trade Capital, Inc. ("Express Trade"), and (10) granting related relief.

## RELIEF REQUESTED

1.      The Debtor seeks entry of the DIP Order, pursuant to sections 362 and 364 of the

Bankruptcy Code and Bankruptcy Rule 4001(c), granting the following relief:[1]

- DIP Line of Credit: Authorizing the Debtor to obtain post-petition financing pursuant to a $150,000.00 secured, super-priority debtor-in-possession line of credit, subject to the terms of that certain Financing Commitment Letter (the "DIP Commitment Letter") substantially in the form attached hereto as **Exhibit B.**

- DIP Liens and Super-Priority Claims: Granting the DIP Liens on the DIP Collateral to secure the DIP Obligations with the relative priorities set forth in the DIP Order, subject to the terms set forth in the DIP Line of Credit; and

- Automatic Stay: Modifying the automatic stay under section 362 of the Bankruptcy Code (the "Automatic Stay") to the extent necessary to implement and effectuate the terms and conditions of the DIP Order, subject to the terms of the DIP Line of Credit.

2.      The Debtor will utilize the funds from the DIP Line of Credit to: (i) satisfy costs

associated with the Debtor's upcoming production run, (ii) pay all amounts outstanding to

Express Trade,[2] and (iii) satisfy other costs associated with this Chapter 11 Case. At this time,

the Debtor is seeking authorization to obtain $95,000 from the DIP Line of Credit on an interim

basis, with the remainder to be approved pursuant to a final order.

3.      The Debtor shall accept and hold all amounts drawn from the DIP Line of Credit

and hold such amounts in its debtor in possession accounts. The Debtor will disperse the funds

necessary to pay the costs associated with its upcoming production run, to Express Trade, and its

Chapter 11 Case in accordance with the Budget and will maintain records of all amounts

dispersed.

4.      In support of this DIP Motion, the Debtor submits the *Declaration of Amy

Driscoll in Support of Debtor Bear's Fruit LLC's Motion for Order (I) Authorizing Debtor*

---

[1]     The summaries contained in this DIP Motion are qualified in their entirety by the provisions of the documents referenced.  To the extent anything in this DIP Motion is inconsistent with such documents, the terms of the applicable documents shall control.

[2]     Debtor understands the amount owed to Express Trade to be approximately $40,000.00.

*Bear's Fruit LLC to Obtain Post-Petition Financing, (II) Granting Liens and Super-Priority Administrative Expense Status Pursuant to Section 364(c) of the Bankruptcy Code, and (III) Granting Related Relief* attached hereto as **Exhibit C** (the "Driscoll Declaration").

## JURISDICTION AND VENUE

5.     On August 15, 2025 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

6.     The United States Bankruptcy Court for the Eastern District of New York (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the "Standing Order of Referral of Cases to Bankruptcy Judges" of the District Court, dated July 10, 1984 (Ward, Acting C.J.). This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). The Debtor confirms its consent to the entry of a final order by this Court regarding this DIP Motion.

7.     Venue of this proceeding is proper pursuant to 28 U.S.C. § 1409.

8.     The statutory predicates for the relief requested herein are sections 105, 362, 364, 503, and 507 of title 11 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure, and Local Bankruptcy Rule 4001.

9.     No trustee, examiner, or statutory committee has been appointed at this time; Gerard R. Luckman has been appointed Subchapter V Trustee.

### Concise Statement Pursuant to Bankruptcy Rule 4001
### Regarding the Terms of the Proposed DIP Line of Credit

10.     In accordance with Bankruptcy Rules 4001(c) and 4001(d), the following is a concise statement and summary of the proposed material terms of the DIP Line of Credit as provided for in the DIP Commitment Letter and the DIP Order:

| DIP Line of Credit Terms | |
|---|---|
| DIP Lender: | Mr. Forwood Cloud Wiser III (the "<u>DIP Lender</u>") |
| DIP Line of Credit Amount: | $150,000.00 |
| Interest Rate: | 4% per annum (only on outstanding principal balance) |
| DIP Collateral: | All of the Debtor's Assets, Accounts Receivable, Inventory, Equipment, and Proceeds thereof. |
| Security: | First priority lien on all of the Debtor's assets (subject to carve-outs) |
| Term: | The duration of the Chapter 11 Case |
| Amortization: | Interest-only payments during Chapter 11 Case |
| Loan Origination Fee: | $0 |
| Loan Exit Fee: | $0 |
| Prepayment: | Permitted without penalty |

## <u>BACKGROUND</u>

### A.  <u>The Debtor's Operations</u>

11.    The Debtor's business focuses on the production and sale of proprietary probiotic sparkling water non-alcoholic beverages. The Debtor operates an asset-light model, utilizing third-party manufacturers to produce its products and specialized vendors for warehousing and distribution.

12.    The Debtor is currently a party to a factoring agreement with Express Trade pursuant to which Express Trade has certain liens on the Debtor's assets.  Subject to authorization from the Bankruptcy Court, the Debtor will use a portion of the proceeds of the DIP Lien of Credit to pay Express Trade in full, after which Express Trade will no longer have any liens of the Debtor's assets.

13.     The Debtor will also use DIP Line of Credit proceeds to fund: (i) various payments to critical vendors and for other costs associated with an August 29th production run; (ii) ongoing storage and distribution costs associated with its products; (iii) essential operating expenses, including court-approved owner compensation, insurance, and administrative costs of this Chapter 11 Case; (iv) sales and marketing commitments to retail partners including Whole Foods and Wegmans; and (v) other Chapter 11 case expenses. All funds shall be used in accordance with the Budget attached as **Exhibit B**.

**B.     The Debtor's Urgent Need for the DIP Line of Credit**

14.     The Debtor has a critical production run scheduled for August 29th, 2025, for which it has already invested over $53,774 in raw ingredients and manufacturing commitments. To the extent that the Debtor cannot pay vendors to keep the run as scheduled, the Debtor stands to lose up to $250,000 in lost revenue and ingredient spoils, as the product is manufactured with perishable ingredients that will expire. The Debtor's continued operations depend on the completion of this production run to fulfill existing customer orders totaling approximately $32,000 scheduled for pickup starting on September 2, 2025, and to maintain ongoing revenue generation. The Debtor is currently out-of-stock on two (2) of its four (4) SKUs, making this production run essential to restore inventory levels and meet customer demand. Any delay would further compromise the Debtor's financial position and ability to continue operations.

**C.     The DIP Line of Credit**

15.     To that end, the Debtor has obtained the DIP Line of Credit from the DIP Lender for a total revolving line of credit of $150,000.00.  This amount will provide sufficient liquidity to cover costs associated with the Debtor's August 29th production run, as well as other costs associated with eth Debtor's operations and this Chapter 11 Case. Among other things, these

funds will also permit the Debtor to remain current on utilities and insurance costs that come due or are outstanding. Subject to Bankruptcy Court approval, the Debtor shall use the funds under the DIP Line of Credit pursuant to the Budget attached hereto as **Exhibit B**.

16.     Accordingly, the Debtor has determined, in its independent business judgement, that obtaining the DIP Financing from the DIP Lender on the terms and conditions set forth in the DIP Commitment Letter provides the estate with the best chance to complete its August 29th production run, which in turn, will maximize a return to creditors in the Chapter 11 Case and is therefore in the best interests of creditors. Absent obtaining the DIP Line of Credit from the DIP Lender on such terms, the Debtor asserts that the Chapter 11 Case is likely to be forced into Chapter 7 and forced liquidation.

17.     Absent access to the funds available under the DIP Line of Credit, the Debtor will promptly lack sufficient liquidity to continue the Chapter 11 Case. Additionally, the Debtor will lack sufficient funds to maintain its operations. Therefore, the Debtor has an immediate need to access the DIP Line of Credit.

### D.     Alternative Sources of Financing Are Not Available on Better Terms

18.     The Debtor will utilize the funds from the DIP Line of Credit to pay costs associated with the August 29th production run, as well as other costs associated with operations and this Chapter 11 Case — including court-approved owner compensation, insurance, sales and marketing commitments with key retail partners, and other case expenses — consistent with the Budget.  To avoid any issues with Express Trade, the Debtor will also use a portion of the DIP Line of Credit to pay Express Trade in full.

19.     Since the Petition Date, the Debtor engaged two parties regarding post-petition financing: (i) Express Trade (the Debtor's prepetition factoring partner) and (ii) Forwood Cloud

Wiser III (the "DIP Lender"). Express Trade indicated it would provide accounts-receivable-only post-petition financing with no inventory lending and would require seventy-five percent (75%) of proceeds from sales of existing inventory to repay its prepetition inventory loan, leaving insufficient liquidity to fund the August 29th production run. Given the compressed timetable, the Debtor was unable to secure third-party financing on acceptable terms. *See Driscoll Declaration.*

20.     The DIP Lender—a current investor in the Debtor—offered a revolving DIP Line of Credit at a fixed four (4%) annual interest rate, with $95,000 available on an interim basis and the balance following a final hearing, without lender fees or burdensome covenants. This pricing is well below the typical ten (10) to twenty percent (20%) market rates for Subchapter V debtor-in-possession financing and represents the least-cost, actionable option available on the required timetable.

21.     After reviewing financing proposals from other parties that would adequately fund the Debtor's continued operations, the Debtor has determined that the offer from the DIP Lender presents the necessary financing at the lowest and best pricing. *See Driscoll Declaration.* ¶¶ Accordingly, the DIP Line of Credit represents the best option available to address the Debtor's immediate liquidity needs and create a pathway to exit from Chapter 11.

## BASIS FOR RELIEF

22.     For the Debtor to obtain the necessary and essential post-petition financing, the Debtor must obtain authority to enter into the DIP Line of Credit pursuant to section 364 of the Bankruptcy Code.

23.     In the instant case, the DIP Lender is seeking, as security for making post-petition advances under the DIP Line of Credit, a first priority lien, to the extent of all such post-petition advances, upon the DIP Collateral pursuant to section 364(c)(2) of the Bankruptcy Code, and a

super priority administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code. By paying Express Trade in full, the Debtor seeks to avoid any issues with Express Trade regarding the liens to be granted pursuant to the DIP Line of Credit.

24.    Importantly, the liens to be granted to the DIP Lender shall neither constitute a lien nor encumber proceeds from recoveries based upon estate causes of action pursuant to sections 542 through 553 of the Bankruptcy Code.

25.    As set forth above, the Debtor made efforts to secure alternative post-petition financing on an unsecured and/or or other less stringent basis and have been unable to obtain any lender willing to make such advances on more favorable terms than proposed herein. In light of all of the foregoing, the Debtor respectfully submits that obtaining the badly needed DIP Line of Credit under the terms of the DIP Commitment Letter is both necessary and in the best interests of the Debtor as well as all of the Debtor's creditors and parties in interest.

**I.      The Debtor Should Be Authorized to Obtain Post-Petition Financing on a Secured and Super-Priority Basis**

26.    The Debtor meets the requirements for relief under section 364 of the Bankruptcy Code, which permits a debtor to obtain post-petition financing and, in return, to grant super-priority administrative status and liens on its property. Specifically, section 364(c)(2) of the Bankruptcy Code provides that the Court may approve financing, "secured by a lien on property of the estate that is not otherwise subject to a lien;", while section 364(c)(1) provides that the Court may approve financing "with priority over any or all administrative expenses..." 11 U.S.C. § 364(c)(1).

27.    Provided that an agreement to obtain secured credit is consistent with the provisions of, and policies underlying, the Bankruptcy Code, courts grant considerable deference to a debtor's exercise of its business judgment when evaluating their requests to incur post-

petition credit. <u>See, e.g.</u>, <u>In re Latam Airlines Grp. S.A.</u>, 2020 WL 5506407 at *27 (Bankr. S.D.N.Y. Sept. 10, 2020) ("Generally, in evaluating the merits of proposed post-petition financing, courts will defer to a debtor's business judgment provided that the financing does not unduly benefit a party in interest at the expense of the estate."); <u>In re Ames Dep't Stores, Inc.</u>, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (deferring to a debtor's "reasonable business judgment. . . so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in interest").

28.     In determining whether the Debtor has exercised sound business judgment in deciding to enter into the DIP Line of Credit, this Court may appropriately take into consideration non-economic benefits to the Debtor offered by a proposed post-petition DIP Line of Credit. For example, in <u>In re ION Media Networks, Inc.</u>, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009), the Bankruptcy Court for the Southern District of New York explained that "noneconomic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization" may be properly considered by debtors when selecting post-petition financing, because the "business decision to obtain credit from a particular lender is almost never based purely on economic terms" due to the importance of those terms. <u>Id</u>.

29.     Here, given all the facts and circumstances present in this Chapter 11 Case, and the immediate need for liquidity associated with the August 29th production run, the Debtor has satisfied the necessary conditions under section 364(c) of the Bankruptcy Code for authority to enter into the DIP Line of Credit. The Debtor exercised proper business judgment in securing the DIP Line of Credit on terms that are fair and reasonable and the best available to it under the

circumstances and in the current market. Moreover, given the circumstances described above, the Debtor could not have obtained credit on an unsecured basis. The Debtor has also taken steps to resolve all issues with Express Trade.

30.     For all the reasons discussed further below, the Debtor respectfully submits that the Court should grant the Debtor's request to enter into the DIP Line of Credit pursuant to section 364(c) of the Bankruptcy Code.

**II.     The Debtor Exercised Sound and Reasonable Business Judgment in Deciding to Enter into the DIP Line of Credit**

31.     Based on the facts and circumstances of this Chapter 11 Case, the DIP Line of Credit represents a proper exercise of the Debtor's business judgment. As noted above, bankruptcy courts routinely defer to a debtor's business judgment on most business decisions, including decisions about whether and how to borrow money. See, e.g., In re Integrated Res., Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992) ("Parties opposing the proposed exercise of a debtor's business judgment have the burden of rebutting the presumption of validity") (citing Aronson v. Lewis, 473 A.2d 805, 812 (Del. 1984)); In re Garrett Motion Inc., No. 20-12212 (Bankr. S.D.N.Y. October 23, 2020) (approving post-petition financing as "a sound and prudent exercise of the Debtors' business judgment"); In re Metaldyne Corp., 409 B.R. 661, 667–68 (Bankr. S.D.N.Y. 2009) (noting "decisions in [the Southern District of New York] emphasizing that [bankruptcy courts] should not substitute [their] business judgment for that of the Debtors'") (citations omitted), aff'd 421 B.R. 620 (S.D.N.Y. 2009); In re Ames Dep't Stores, Inc., 115 B.R. at 40 ("More exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially."); In re Simasko Prod. Co., 47 B.R. 444, 449 (D. Colo. 1985) ("Business judgments should be left to the board room

and not to this Court."); In re Lifeguard Indus., Inc., 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same). "More exacting scrutiny would slow the administration of the debtor's estate and increase its costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." Richmond Leasing Co. v. Capital Bank. N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).

32.     Specifically, when evaluating whether a debtor's decision to obtain post-petition financing was an exercise of sound business judgment, courts need only "examine whether a reasonable businessperson would make a similar decision under similar circumstances." In re Dura Auto. Sys., Inc., 2007 WL 7728109, at *97 (Bankr. D. Del. Aug. 15, 2007) (quoting In re Exide Techs., 340 B.R. 222, 239 (Bankr. D. Del. 2006)). When evaluating whether a debtor's decision to enter into post-petition financing was an exercise of sound business judgment, bankruptcy courts consider the terms of the financing in light of the debtor's circumstances and the market for financing more generally. See In re Farmland Indus., Inc., 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen McLean Oil Co., Inc.), 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization). In general, a bankruptcy court should defer to a debtor's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary and capricious. In re Curlew Valley Assoc., 14 B.R. 506, 511-13 (Bankr. D. Utah 1981). Courts generally will not second-guess a debtor's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of [its] authority under the Code." Id. at 513-14 (footnotes omitted).

33.    Prevailing market conditions are also highly relevant to a court's evaluation of a debtor's business judgment regarding their DIP financing. See Hr'g Tr. at 734 35:24, In re Lyondell Chem. Co., Case No. 09-10023 (Bankr. S.D.N.Y. March 5, 2009) (recognizing "the terms that are now available for DIP Financing in the current economic environment aren't as desirable" as in the past). Accordingly, the Debtor submits that the proposed DIP Line of Credit should be approved as a sound exercise of its business judgment. Despite the exigent circumstances, the Debtor has successfully negotiated financing that provides ample liquidity, attractive pricing, flexible budget covenants, to allow for continued operations. The Debtor has also exercised sound business judgment in determining that a post-petition loan to provide liquidity during this critical time is both necessary and appropriate and has satisfied the legal prerequisites to borrow under the DIP Line of Credit. The terms of the DIP Line of Credit are fair and reasonable and are in the best interests of the Debtor's estate. Accordingly, the Debtor should be granted authority to enter into the DIP Line of Credit and borrow funds from the DIP Lender on the terms set forth in the DIP Commitment Letter, with the total DIP Line of Credit to be secured with a first priority mortgage on the DIP Collateral.

**III.    The Debtor is Unable to Obtain Financing on More Favorable Terms Than the DIP Line of Credit.**

34.    Debtors need to demonstrate that they made a reasonable effort to find alternative financing before a bankruptcy court will order super-priority liens. In re Latam Airlines Grp. S.A., 2020 WL 5506407, at *26 (Bankr. S.D.N.Y. Sept. 10, 2020). But, the Bankruptcy Code "imposes no duty [on a debtor] to seek credit from every possible lender before concluding that such credit is unavailable." Id. (citing Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986)); In re Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp., 266 B.R. 575, 584−85 (S.D.N.Y. 2001) (super-priority administrative expenses

authorized where debtor could not obtain credit as an administrative expense); In re Ames Dep't Stores, Inc., 115 B.R. at 40 (approving financing facility and holding that debtor made reasonable efforts to satisfy the standards of section 364(c) to obtain superior terms after discussing possible post-petition financing with four lenders); In re Mosello, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996).

35.    Moreover, when only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc., 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).

36.    Here, the Debtor does not believe that comparable alternative sources of financing are reasonably available on similar pricing given limited time period the funds are needed and the reality of the DIP Collateral. The Debtor conducted arm's-length negotiations with the DIP Lender regarding the terms of the DIP Commitment Letter. The terms offered by the DIP Lender provided for the structure of the DIP Line of Credit. Through negotiations with the DIP Lender, the Debtor improved the economic and other terms of the DIP Line of Credit, which is the best financing proposal reasonably available under the circumstances.  Moreover, given the exigent circumstances, fewer lenders could have supplied funding to the Debtor's on such a limited time frame.

37.    As will be shown at the hearing, a line of credit of the type needed in this case could not have been obtained on an unsecured basis. Alternative sources of proposed DIP financing for the Debtor are extremely limited. None of the alternative potential sources of post-petition financing proposed a line of credit that would meet the Debtor's requirements or that

were on better pricing terms. In these circumstances, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *In re Snowshoe Co.,* 789 F.2d 1085, 1088 (4th Cir. 1986).

38.    A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of Section 364(c) and (d).  Id.; see also In re Plabell Rubber Prods., Inc., 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992). Where there are few lenders likely to be able and willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing." In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd, 99 B.R. 117 (N.D. Ga. 1989). The Debtor submits that due to its current capital structure, that alternative credit on more favorable terms is unavailable to the Debtor.

39.    In sum, the DIP Line of Credit represents the Debtor's best available post-petition financing option.

**IV.    The Terms of the DIP Line of Credit Are Fair, Reasonable, and Adequate under the Circumstances.**

40.    In considering whether the terms of post-petition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. See In re Farmland Indus., Inc., 294 B.R. at 886; see also In re Ellingsen MacLean Oil Co., 65 B.R. at 365. The appropriateness of a proposed financing line of credit should also be considered in light of current market conditions. See In re Lyondell Chem. Co., No. 09-10023 (REG) (Bankr. S.D.N.Y. Feb. 27, 2009), Hr'g Tr. 740:4-6 ("[B]y reason of present market conditions, as disappointing as the [DIP] pricing terms are, I find the provisions [of the DIP] reasonable here and now."). Here, the terms of the DIP Line of Credit are fair, appropriate,

reasonable, adequate under the circumstances, and in the best interests of the Debtor, its estate, and its creditors.

41.    As noted above, the terms of the DIP Line of Credit were actively negotiated by the Debtor. Under the current circumstances, the pricing, fees, and other economics provided for in the DIP Line of Credit, taken as a whole, are reasonable and in the Debtor's best interests, and present the best terms available.

42.    No party in interest can seriously contend that the Debtor does not need immediate access to funds to fund their operations. The Debtor has limited funds and income. It also requires funds immediately to fund its August 29th production run.  Access to sufficient and immediate credit is therefore critical to the Debtor. In the absence of immediate access to credit, the Debtor will not be able to continue its ongoing operations and funds its August 29th production run. The inability of the Debtor to meet these obligations may negatively impact the results of the Chapter 11 Case.

43.    Moreover, the amounts to be provided under the DIP Line of Credit comport with the amounts needed to complete the manufacture of its products, pay utilities and taxes and other charges, all in accordance with the Budget attached hereto.  The amounts also comport with amounts needed to pay Express Trade in full so to avoid any issues regarding the liens to be issued pursuant to the DIP Line of Credit.

44.    For these reasons, access to credit under the DIP Line of Credit is critical. The Debtor's need for access to the DIP Line of Credit therefore is immediate.

**V.    The DIP Lender Should Be Deemed a Good Faith Lender Under Section 364(e).**

45.    Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the

authority of the debtor to obtain such loans or to grant such liens is later reversed or modified on appeal. Section 364(e) provides that: The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal. 11 U.S.C. § 364(e).

46.    Here, the Debtor believes the DIP Line of Credit embodies the most favorable terms on which the Debtor could obtain post-petition financing. As described in the Driscoll Declaration Exhibit C), the negotiations of the terms of the DIP Line of Credit with the DIP Lender were conducted at arms' length. Under the circumstances, the terms and conditions of the DIP Line of Credit are reasonable, and the proceeds of the DIP Line of Credit will be used only for purposes that are permissible under the Bankruptcy Code, in accordance with the DIP Order and the DIP Commitment Letter and in accordance with the Budget. Accordingly, the Court should find that the DIP Lender is a "good faith" lender within the meaning of section 364(e) of the Bankruptcy Code and that the DIP Lender is thus entitled to all of the protections afforded by that section.

## NOTICE

47.    Pursuant to sections 102(1), 363(c), and 364 of the Bankruptcy Code and Bankruptcy Rules 4001(b) and (c), notice of this DIP Motion has been provided to: (i) the Debtors' 20 largest unsecured creditors, (ii) the United States Trustee and the Subchapter V Trustee, and (iii) all parties having filed notices of appearance.

## **RESERVATION OF RIGHTS**

48.     Nothing contained herein or any actions taken pursuant to such relief requested is intended or shall be construed as: (a) an admission as to the amount of, basis for, or validity of any claim against the Debtor under the Bankruptcy Code or other applicable non-bankruptcy law; (b) a waiver of the Debtor's or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this DIP Motion or any order granting the relief requested by this DIP Motion or a finding that any particular claim is an administrative expense claim or other priority claim; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtor's estate; (g) a waiver or limitation of the Debtor's, or any other party in interest's, rights under the Bankruptcy Code or any other applicable law; or (h) a concession by the Debtor that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this DIP Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtor's or any other party in interest's rights to subsequently dispute such claim.

## **COMPLIANCE WITH RULE 4001-2 OF THE LOCAL BANKRUPTCY RULES**

49.     Rule 4001-2 of the EDNY Local Bankruptcy Rules requires that certain provisions contained in DIP Line of Credit be highlighted, and that the debtor must provide

justification for the inclusion of such highlighted provision(s). The Debtor believes that certain provisions of Local Rule 4001-2 are implicated, but that this DIP Motion provides adequate disclosure regarding such provisions. The Debtor has set forth each of the sub-sections of Rule 4001-2 of the Local Rules and have detailed whether this DIP Motion contains or contemplates provisions which would fall within the ambit thereof:

- Local Rule 4001-2(a)(1): This DIP Motion and the Budget annexed hereto set forth the amount of DIP funding the Debtor seeks to use.

- Local Rule 4001-2(a)(2): This DIP Motion provides that the Debtor may use the DIP Line of Credit proceeds in accordance with the Budget.

- Local Rule 4001-2(a)(3): This DIP Motion and the DIP Commitment Letter set out the fees to be incurred in connection with the making of the DIP Line of Credit.

- Local Rule 4001-2(a)(4): This DIP Motion describes the effects on existing liens of the granting of the DIP Liens and DIP Super-Priority Claims being provided to the DIP Lender.

- Local Rule 4001-2(a)(6): There are no cross-collateralization provisions, which elevate pre-petition debt to administrative expense (or higher) status. This DIP Motion provides that the DIP Lender shall receive a post-petition lien on the DIP Collateral to the extent of the advances made under the DIP Line of Credit only.

- Local Rule 4001-2(a)(7): The Debtor is not seeking approval of any roll-up provisions.

- Local Rule 4001-2(a)(8): The Debtor does not believe it is seeking approval of any provision that would limit the Court's power or discretion in a material way, or that would interfere with the exercise of the Debtor's fiduciary duties, or restrict the rights and powers, of the Debtor, or any committee or other fiduciary.

- <u>Local Rule 4001-2(a)(9)</u>: The Debtor is not seeking approval of any limitation on the DIP Lender's ability to fund certain activities of the Debtor or any committee appointed under sections 1102 or 1114 of the Bankruptcy Code except to the extent set forth in the Budget.

- <u>Local Rule 4001-2(a)(10)</u>: The default provisions under the DIP Line of Credit are described in the DIP Motion and the DIP Commitment Letter.

*[Remainder of Page Intentionally Left Blank]*

**WHEREFORE**, the Debtor respectfully requests that the Court: (i) enter the proposed DIP Order, substantially in the form attached as **Exhibit A**, granting the relief requested in this DIP Motion on a final basis, and (ii) grant the Debtor such other and further relief as is just and proper.

Dated:  White Plains, New York
   August 25, 2025

                **DAVIDOFF HUTCHER & CITRON LLP**

                By:  /s/ Robert L. Rattet
                   Robert L. Rattet, Esq.

                   605 Third Avenue
                   New York, New York 10158
                   (914) 381-7400

                   *Proposed Attorneys for the Debtor*
                   *and Debtor-in Possession*

**Exhibits**

Exhibit A – Proposed DIP Interim Order
Exhibit B – DIP Commitment Letter and Budget
Exhibit C – Driscoll Declaration